(108 So. 53)

**CHEMICAL NAT. BANK OF NEW YORK v. JACKSON, Superintendent of Banks.**

(3 Div. 725.)

(Supreme Court of Alabama. Jan. 21, 1926. Rehearing Denied April 22, 1926.)

**1. Banks and banking ⚖➝102.**

President of a banking corporation, by usage as well as by express authority, may be invested with powers usually exercised by cashier or board of directors.

**2. Banks and banking ⚖➝105(2)—Bank held bound by president's acts in procuring plaintiff bank to sell cotton company's drafts and credit proceeds to his bank, and by his guaranty of obligation.**

Where president of bank was shown by evidence its managing head in all its affairs, held that president's bank was liable for indebtedness incurred by president in procuring plaintiff bank to sell cotton company's drafts or notes and procuring proceeds thereof to be placed to credit of his bank, and was further bound by president's guaranty that bank would meet obligation of cotton company.

**3. Banks and banking ⚖➝63½.**

As respects claim against bank in hands of state superintendent of banking, held that custom of local banks to permit withdrawals by pledgors of warehouse cotton receipts did not defeat claims of cestui que trust, whose security has been dissipated.

**4. Banks and banking ⚖➝63½—Insolvent bank in charge of state banking superintendent became indebted to plaintiff bank by permitting warehouse receipts, which it agreed to hold as trustee for plaintiff, to be withdrawn by pledgor.**

Insolvent bank, which was indebted to plaintiff bank, and which had agreed to hold warehouse receipts as trustee for plaintiff, became indebted to plaintiff bank in permitting pledgor to secure such warehouse receipts and dispose of pledged property to a depletion of plaintiff's security, bank being charged with reasonable skill and diligence to keep pledge intact, since bailment of receipts was not gratuitous merely.

**5. Banks and banking ⚖➝63½—As respects claim against bank in charge of state banking superintendent, that plaintiff bank's cashier responded to insolvent bank's telegram without declaring insolvent bank was liable as guarantor of paper held not to show that plaintiff bank was financing such parties as stated therein.**

Where plaintiff bank was notified by insolvent bank that "parties you are financing on acceptance are involved," fact that plaintiff's cashier responded to request to come contained therein, without declaring that insolvent bank was liable as guarantor of paper, was not significant as evidencing that insolvent bank's understanding was that plaintiff bank was financing such party.

**6. Estoppel ⚖➝53.**

Waiver is a question of intention.

**7. Banks and banking ⚖➝63½—As respects claim against bank in hands of state banking superintendent, plaintiff bank's acceptance of renewal notes from cotton company held to have no effect upon plaintiff's claims against insolvent bank as guarantor of such company's obligations.**

Where plaintiff bank accepted from cotton company and its trustee new notes renewing notes previously held by plaintiff, that fact did not operate to discharge plaintiff's claim against insolvent bank, which was a guarantor of obligation of cotton company to plaintiff, there being nothing shown to indicate intention to waive claim against guarantor.

**8. Principal and agent ⚖➝147(2).**

One who deals with an agent must know the extent of his authority.

**9. Banks and banking ⚖➝63½.**

Superintendent of banks on insolvency takes property of bank subject to all equities existing at time he went into possession.

**10. Banks and banking ⚖➝63½—Insolvent bank and superintendent of banks held bound by representations made and methods employed by bank's agents to effect release of indebtedness, where they sought benefit of such agreement as long as it appeared beneficial.**

Where bank's agents fraudulently induced plaintiff bank to release part of its indebtedness by misrepresentations as to solvency of guarantors of note given for released portion of debt, the insolvent bank and the superintendent of banks were bound by such representations and methods, where they sought the benefit of the agreement as long as it appeared to be beneficial.

**11. Banks and banking ⚖➝63½—As respects claim against bank in charge of state banking superintendent, contention that there was no evidence of representation that guarantors had "combined net worth" over and above their liabilities of sum as alleged in complaint held too trivial to require determination on other than merits.**

In an action against superintendent of banks to compel recognition of indebtedness, bill alleging that officers of insolvent bank

---

⚖➝For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

fraudulently procured plaintiff to release portion of indebtedness, on representations that guarantors of note given for released portion of indebtedness were solvent and responsible men, having a "combined net worth" over and above their liability of $176,000, contention that there was no evidence of a representation that guarantors had such a "combined net worth," meaning owners in common of assets to that amount, *held* to be too fine a point to require decision of case on other than its merits.

**12. Banks and banking ⬤➣63½—As respects claim against bank in charge of state banking superintendent, evidence held to show that bank's officers relied on representations as to solvency of guarantors of released indebtedness (Code 1923, § 6565).**

Evidence *held* to show that officers of plaintiff bank relied on representations made by officers of insolvent bank as to solvency of guarantors of note given to plaintiff bank to release portion of insolvent bank's indebtedness to it, especially since no objection was made to deposition by plaintiff's officers that they relied upon such representations, even though objection to such testimony, under Code 1923, § 6565, was unnecessary.

**13. Banks and banking ⬤➣63½—In bill against superintendent of banking, averment that plaintiff bank relied on statements of solvency and net worth of individuals held to be taken as averment that it relied on written as well as verbal statements.**

In a bill against superintendent of banks alleging that officers of insolvent bank had fraudulently procured a release of its indebtedness to plaintiff bank by misrepresenting solvency of guarantors of note given for release thereof, *held*, averment that plaintiff relied on such statements of solvency and net worth of said individuals should be taken as an averment that it relied upon written as well as verbal statements, though it was not averred that any *of the statements were in writing.*

**14. Fraud ⬤➣49.**

Fraudulent representations must be proved as alleged.

**15. Banks and banking ⬤➣63½—As respects claim against bank in hands of state banking superintendent, fraud in procuring release of indebtedness by misrepresentations as to solvency of guarantors of indebtedness released held established by proof.**

In action against superintendent of banks to compel recognition of claim of plaintiff bank against insolvent bank, alleged fraud of insolvent bank's officers in procuring release from plaintiff bank of part of indebtedness by misrepresentations as to solvency of guarantors of released indebtedness *held* established by proof.

**16. Contracts ⬤➣94(3)—Misrepresentation of material fact on which another has right to rely, whether made willfully or intentionally or through mistake, inadvertence, or ignorance, will operate to avoid contract founded on it, being fraud in law (Code 1923, § 8049).**

Misrepresentation of material fact on which another has a right to rely, whether made willfully or intentionally or through mistake, inadvertence, or ignorance, will operate to avoid a contract founded on it, being a fraud in law (Code 1923, § 8049).

**17. Banks and banking ⬤➣63½—As respects claim against bank in charge of state banking superintendent, plaintiff need not have relied alone upon misrepresentations averred and proved to recover, it being sufficient if they formed material part of inducement to transaction.**

Plaintiff bank, alleging that insolvent bank by officers fraudulently procured release of part of indebtedness by false representations as to solvency of guarantors of released debt, need not have relied alone upon the representations averred and proved, it being sufficient if the representation of insolvent bank's agent contributed in material part to induce plaintiff's release of liability.

**18. Banks and banking ⬤➣63½—Plaintiff's failure to inform superintendent of banks of insolvent bank's representations did not preclude plaintiff from thereafter seeking relief for fraud in procuring release of liability.**

That plaintiff bank, on notifying superintendent of banks of its acceptance of insolvent's proposition to release it of part of indebtedness, did not notify the superintendent of the representations made in order to secure that release, did not preclude plaintiff from thereafter seeking relief for fraud of insolvent's agents in misrepresenting solvency of guarantors of released indebtedness in procuring such release.

**19. Banks and banking ⬤➣63½—As respects claim against bank in hands of state banking superintendent, fraudulent transaction for release of indebtedness held not ratified by plaintiff by applying proceeds of insolvent's collateral to payment of note which was part of transaction, where insolvent was originally indebted in sum represented by such note.**

Where officers of insolvent bank fraudulently procured from plaintiff a release of portion of its indebtedness by misrepresenting solvency of guarantors of released debt, the fact that plaintiff thereafter applied proceeds of insolvent's collaterial to payment of a note which constituted part of such agreement did not ratify the transaction, inasmuch as insolvent bank was originally indebted to plaintiff in the sum represented by such note.

Appeal from Circuit Court, Montgomery County; Walter B. Jones, Judge.

Bill in equity by the Chemical National Bank of New York against A. E. Jackson, as Superintendent of Banks, in charge of the Merchants' Bank of Montgomery, with cross-bill by defendant. From a decree denying relief to complainant, and awarding relief to respondent, complainant appeals. Reversed and remanded.

Rushton, Crenshaw & Rushton, of Montgomery, for appellant.

---

⬤➣For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Misrepresentation of a material fact, made by mistake or innocently, if acted upon by the opposite party, constitutes legal fraud in such sort as to authorize rescission. Code 1923, § 8049; Hockensmith v. Winton, 66 So. 954, 11 Ala. App. 670; McCoy v. Prince, 73 So. 386, 197 Ala. 665. It is not necessary that a misrepresentation should be the sole cause or inducement of a transaction; it is enough that it constitutes a material inducement. Jordan v. Pickett, 78 Ala. 331; 26 C. J. 1189. Insolvency may be proved by circumstantial evidence; inability of the creditor to collect tends to show insolvency. Hudson v. Bauer, 16 So. 693, 105 Ala. 200. The superintendent of banks, when he takes charge of the affairs of an insolvent bank, stands in the shoes of the bank, and is subject to all defenses and rights available against the bank. Walker v. Mutual, etc., Co., 71 So. 697, 196 Ala. 154; Montgomery v. Chemical National Bank, 96 So. 898, 209 Ala. 585; Sterrett v. National Bank, 246 F. 753, 159 C. C. A. 55, 3 A. L. R. 256. The powers of the superintendent are advisory; he has no authority to bind the bank. Tecumseh National Bank v. Chamberlain Banking House, 88 N. W. 186, 63 Neb. 163, 57 L. R. A. 811. A receiver represents only general creditors, and cannot represent a special set of creditors. Marion Trust Co. v. Blish, 84 N. E. 814, 85 N. E. 344, 170 Ind. 686, 18 L. R. A. (N. S.) 347. An essential element of an estoppel is injury, and in the absence of injury estoppel does not operate. Adler v. Pin, 80 Ala. 351; Jackson v. Lancaster, 104 So. 19, 213 Ala. 97. A custom to be binding must be reasonable, and must not be contrary to established law, inconsistent with good morals, or in conflict with general or public policy. Zimmern v. Southern R. Co., 96 So. 226, 209 Ala. 284, 29 A. L. R. 1237; 27 R. C. L. 159. A principal will not be allowed to profit by the fraud of his agent; and if, though ignorant of the fraud, he adopts a fraudulent contract made in his behalf, he must make compensation to the injured party. Williamson v. Tyson, 17 So. 336, 105 Ala. 653. Where the bailee derives any benefit from the bailment, the bailment is lucrative, and the bailee is held to the exercise of due care. Prince v. Ala. St. Fair, 17 So. 449, 106 Ala. 340, 28 L. R. A. 716; Montgomery v. Chemical National Bank, supra.

Horace Stringfellow and Steiner, Crum & Weil, all of Montgomery, for appellee.

Taking a note for a cause of action on which a tort could be maintained is a waiver of the tort. 1 C. J. 1039. A release of the Hall-Beale Company was a release of the Merchants' Bank. Smith v. Gayle, 58 Ala. 600. There was no evidence of specific authority of Gaddis and Lancaster, and appellant was charged with the duty of ascertaining the extent of their authority. Merrill v. Worthington, 46 So. 477, 155 Ala. 286. As president, Gaddis had no authority to enter into a contract of guaranty on behalf of the bank. Montgomery Bank v. Walker, 61 So. 951, 181 Ala. 368. Testimony that the officers of appellant relied upon the truth of statements made by Gaddis and others was incompetent. Sledge v. Scott, 56 Ala. 202. There being no allegations that financial statements were given, or that they were authorized, or that they were relied upon, testimony of reliance cannot be made the ground for relief. When relief is sought against an instrument on ground of fraud, the fraud must not only be clearly proved, but the fraudulent representations must be proved as alleged. Johnson v. Rogers, 20 So. 929, 112 Ala. 578. Appellant does not come with clean hands, and is not entitled to relief. Harton v. Little, 65 So. 951, 188 Ala. 648.

SAYRE, J. In a general but sufficient way appellant's bill in this cause was stated in Montgomery v. Chemical National Bank, 96 So. 898, 209 Ala. 585. Upon the return of the cause to the trial court, sitting in equity, the bill was amended to meet the defect pointed out on the first appeal, and in some other minor respects to which we may refer later on. Defendant, Jackson, who took the place of Montgomery as his successor in the office of state superintendent of banks, made his answer a cross-bill. Everything, in short, was denied, and cross-relief prayed on the theory that the Merchants' Bank had not at any time prior to its indorsement of the note for $33,780 been answerable to appellant Chemical Bank for the amount represented by that note, and that when appellant repudiated the agreement in virtue of which it had accepted the $60,000 note, along with the note for $33,780, in consideration of its release of the Merchants' Bank on account of the transaction involving the two banks and the Hall-Beale Cotton Company, it of necessity repudiated the entire transaction, the $33,780 included, and so became liable to the Merchants' Bank to the extent of its collections in the meantime of collaterals pledged with it to secure another and different indebtedness of the Merchants' Bank to it in the sum of $100,000—that is, liable to the extent its collections exceeded the amount of its separate claim of $100,000. Upon final hearing upon pleading and proof it was decreed that appellant was not entitled to relief against the agreement whereby it released the Merchants' Bank from its claim of indebtedness to the extent of $60,000, this, because no fraud had been shown, and further because, in any event as to that, appellant had estopped itself to claim such relief—by conduct, we presume, which is urged in the brief and will be hereafter noticed in necessary detail —but the particular grounds of which are not stated. Thus the validity of the agree-

ment against which appellant seeks relief was decreed, and upon that hypothesis a reference was ordered to ascertain the status of the account between the banks to the end that a decree might be rendered on the cross-bill for the amount, if any, by which appellant's collections exceeded defendant's other indebtedness of $100,000 and its indorsement of the Hall-Beale note for $33,780. The complainant in the original bill, Chemical National Bank, prosecutes this appeal.

Appellee denies that the Merchants' Bank was ever indebted to appellant bank on account of the drafts drawn by the Hall-Beale Company on itself in the sum of $100,000 and sold by appellant in New York, the proceeds being placed to the credit of the Merchants' Bank with appellant, a similar credit being at the same time given to the Hall-Beale Company on the books of the Merchants' Bank. This credit was afterwards used by the Hall-Beale Company. We shall not undertake to answer this argument in its utmost detail. The elaboration of its ingenuity forbids the effort. We purpose to notice its most impressive points. Its mainstay is found in the assertion that when Gaddis undertook to represent the Merchants' Bank in the matter of securing a loan of $100,000 from the Chemical Bank for the Merchants' Bank, or for the Hall-Beale Company, if the latter form of statement be preferred, he had no authority from the Merchants' Bank—indeed, apart from some meticulous suggestions of a lack of agreement between allegata and probata, this is the one assertion without which the entire argument, on this branch of the case, falls to the ground.

[1, 2] Perhaps a sufficient refutation of this contention is found in the fact that in the beginning of the relationship between the two banks, that is to say, when the owners of the Merchants' Bank took over the stock and business of its predecessor and changed its name to "Merchants' Bank of Montgomery" and sought to establish a connection with the Chemical Bank as its New York correspondent, the last-named bank required that the board of directors of the Merchants' Bank pass a resolution authorizing the president—who then, and afterwards until the bank went into the hands of the superintendent of banks, was Gaddis—the vice president and cashier, or either of them, among other things, to "effect loans at any time for the Merchants' Bank from the Chemical National Bank, and for such loans to make, execute, and deliver promissory notes, commercial paper, and other written obligations of this bank, * * * to sell or discount or rediscount commercial paper, bills receivable, securities, and other instruments and evidences of debt at any time held by this bank or subject to its control; and to that end to indorse and assign, transfer, and deliver the same." The directorate of the Merchants' Bank passed this resolution. In passing it they, of course, had not in mind the transaction here in question, as appellee suggests, for this transaction had then not been conceived; but, obviously, that is of no consequence, for, on its face, the resolution was broadly intended to cover all future transactions between the two banks, and, evidently, to prevent just such difficulties as have arisen in this case out of the plea that Gaddis had acted, though apparently for the bank, in fact without authority. This power appears to be comprehensive enough to cover the transactions now in judgment, but whether any refinement, of which the parties then were innocent, may distinguish and eliminate them, the Merchants' Bank was bound, for the reason that Gaddis had all along been its "managing head" and had "negotiated its lines of credit in New York." These are the expressions of Noble, its vice president and cashier, testifying as a witness in the cause, and they confirm the strong impression, made by the evidence as a whole, that Gaddis was the managing head of the bank in all its affairs. Montgomery Bank & Trust Co. v. Walker, 61 So. 951, 181 Ala. 368, is cited by appellee. That case abundantly shows that by usage, as well as by express authority, the president of a banking corporation may be invested with all the powers usually exercised by its cashier or board of directors. When Gaddis procured the Chemical Bank to sell the Hall-Beale Company's notes or drafts in New York, the proceeds to be placed to the credit of the Merchants' Bank, the Chemical Bank required, and Gaddis, acting as president of the Merchants' Bank, agreed, that the local bank would guarantee that the Hall-Beale Company would meet the obligation thus shown within 60 days.

[3, 4] Payment of the Hall-Beale obligation was secured by the deposit with the Merchants' Bank of warehouse receipts for 1,185 bales of cotton, and in its dealing with appellant, the bank, the Merchants' Bank, agreed to hold these receipts as trustee for the appellant. Officers and members of the bank, other than Gaddis, depose that they knew nothing of his guaranty on behalf of the bank, and it may be assumed that they were not informed of his express undertaking on behalf of the bank to hold these receipts in trust; but they knew everything else in connection with the transaction, and, on appellee's showing, apart from any express engagement as trustee, the bank held these receipts in trust for appellant. And yet the bank, on some fraudulent pretense by the Hall-Beale Company that they needed possession of the receipts in order to realize upon the cotton, allowed one member of the Hall-Beale Company, a partnership, to dispose of 1,000 bales of the cotton so that the benefit of the pledge to that extent was wholly lost to appellant, whose recourse against the Hall-Beale Company was there-

after utterly valueless. It may have been a custom among local banks, as some of the evidence went to show, to permit such withdrawals by pledgors of warehouse cotton receipts, but we apprehend that the excuse of such custom will not suffice to answer the claims of a cestui que trust whose security has been dissipated in that manner. It cannot be said that the bailment shown by the deposit of these receipts with the Merchants' Bank was gratuitous merely, and so that the bailee was chargeable with only slight care, for it is clear enough that the bank was engaged in this business for some benefit to be derived by it, directly or indirectly, and that it was chargeable with reasonable skill and diligence to keep the pledge intact. Prince v. Ala. State Fair, 17 So. 449, 106 Ala. 340, 28 L. R. A. 716. But, whatever may be thought of the wisdom of the alleged custom of the banks in dealing with their own securities, our opinion is that a trustee may not take such liberty with collaterals held for another, and that, on this account also, it may be safely held that the Merchants' Bank became indebted to appellant.

[5] When the Hall-Beale Company verged on utter insolvency and the Merchants' Bank was headed in the same direction, Gaddis telegraphed to the Chemical Bank, or Jackson, its cashier, afterwards vice president, advising them that the "parties you are financing on acceptance, involved," and suggesting that he come to Montgomery. This is referred to as evidencing the Merchants' Bank's understanding that appellant was "financing"—whatever that may mean—the Hall-Beale Company, and so likewise it is considered by appellee to be significant that Jackson came, without declaring that the Merchants' Bank was liable as guarantor on the Hall-Beale paper. We need only say that we are not at all impressed with the force of this argument. Jackson and his bank were very willing to help the Merchants' Bank in its difficulty—probably, for one thing, because it was largely indebted to appellant on other accounts—and there was no particular occasion for protestation, which could have changed nothing of what had gone before.

[6, 7] Jackson came, and in conference of the Merchants' and other banks interested as creditors of the Hall-Beale Company it was arranged that a trustee take over the business of that company, and the company and the trustee gave appellant notes for the amount of the indebtedness due on account of the transaction in question. Chemical Bank accepted these notes, and in a subsequent communication Jackson spoke of them as having been taken in lieu of the acceptances it had been previously carrying. Upon this appellee's brief predicates a release of the Merchants' Bank upon the theory that the acceptance of satisfaction from one joint trespasser discharges all, and that "taking

a note for a cause of action on which a tort could be maintained is a waiver of the tort," to which propositions Smith v. Gayle, 58 Ala. 600, and 1 C. J. p. 1039, § 168, are cited. If it were assumed for sake of argument that appellant's only claim against the Merchants' Bank was for the tort involved in the fraudulent destruction of appellant's lien on 1,000 bales of cotton, still, waiver is a question of intention, as the cited authorities show, and there is nothing to indicate a. waiver. The record shows that the new notes were nothing more than renewals of the notes previously held by appellant and had nothing to do with appellant's claim against the Merchants' Bank as guarantor. Moreover, as we think we have shown, appellant's claim against the Merchants' Bank was and is sustained as a claim resting on express contract induced by Gaddis' communication with appellant prior to the time when appellant let the bank have $100,000 of its money to be used for the benefit of the Hall-Beale Company.

Still later, after the transactions heretofore stated, the superintendent of banks became apprised of the difficulties under which the Merchants' Bank labored, and required, as a condition of keeping its doors open, that the claim of the Chemical Bank on account of the Hall-Beale transaction be eliminated. Not to prolong the statement too far, Gaddis, three of the directors of his bank, and Lancaster, Gaddis' brother-in-law, who was interested in the bank as a stockholder, who, as it seems, the other stockholders hoped might soon replace Gaddis and was shortly thereafter elected a director, and who had been frequently in and out of the bank engaged in an effort to straighten out some of its affairs, these five went to New York to arrange things so as to satisfy the superintendent of banks. That the rest of them represented the bank there is no reason to doubt. As for Lancaster, his testimony is that he was in New York on "business for the bank," and there is no pretense that his business was different in any respect from that of his companions. One of them, Joseph, testifies:

"We went up there for the purpose of putting the Chemical Bank straight as to the attitude the Merchants' Bank took as to their [meaning the bank's] liability, and to secure a statement from the Chemical Bank that it would not hold the Merchants' Bank liable."

But in fact they entered into a tentative agreement with appellant, and the rest of them left Gaddis and Lancaster in New York to complete the arrangement. Gaddis thereupon, with Jackson representing the Chemical Bank, entered into an agreement substantially as averred in the original bill in this cause. The agreement was (and it makes no difference from whom its precise suggestion came) that the Chemical Bank

would accept Hall's note for $33,780 (Hall had made away with the cotton) to be secured by a pro rata interest in the assets of Hall-Beale Company in the hands of the trustee, Elmore, and by the indorsement of the Merchants' Bank, the balance of the sum then due to the Chemical Bank, viz., $60,000, to be secured by Hall-Beale Company's note with good and sufficient guarantors to be furnished by Gaddis, after which the Merchants' Bank would stand released from appellant's claim to the extent of $60,000. Gaddis, along with three others, relatives and business associates of his, indorsed the note for $60,000. This arrangement, if unaffected by fraud, operated to "reduce" the indebtedness of the bank, as averred. As to that, the claim of variance is unfounded.

[8-10] Appellee contends that the arrangement entered into by Gaddis and Lancaster, the rest of the delegation to New York evidently approving, exceeded their authority, as shown by the testimony of Joseph quoted above. But they dealt with Jackson as agents duly authorized. Their principal was in fact indebted to the Chemical Bank, and they secured a statement, in effect, from the Chemical Bank that it would not hold the Merchants' Bank liable to the extent of $60,000—this in strict agreement, pro tanto, with their authority, though it be measured by Joseph's testimony. Upon his version of their agency even, it is to be implied that they were authorized to do what might be considered to be reasonable and necessary to induce the release. But aside from any implications, what was done by Gaddis and Lancaster was afterwards reported to the board of directors of the Merchants' Bank at Montgomery, approved by them, reported then to the superintendent of banks, in consideration whereof he permitted the bank to remain open for business, whereas, otherwise, it would have been closed without further parley. There can be no doubt that the bank heartily approved the arrangement. It relieved the bank of a liability of $60,000 asserted against it with every appearance of genuine validity, whatever the directors may have thought of it, and it permitted them to remain in business with the hope of retrieving the bank's failing fortunes. It is too late now for them to deny the authority of the agreement. One who deals with an agent must know the extent of his authority, but the Merchants' Bank and appellee, superintendent of banks, the last named of whom took the property of the bank subject to all equities existing at the time he went into possession (Montgomery v. Bank, supra), are bound by the representations made and methods employed by their agents to effect the agreement of which they sought the benefit as long as it appeared to be beneficial. Williamson v. Tyson, 17 So. 336, 105 Ala. 644.

[11] The averment of the amended bill is that B. L. Gaddis and W. L. Lancaster, as officer and agent respectively of the bank, agreed that they "would furnish good and sufficient indorsers or guarantors for the $60,000 note, and did represent to your orator that * * * [Gaddis and the three who signed with him] were each solvent and responsible men of large holdings of property, having a combined net worth over and above their liabilities of, to wit, $176,000." Evidence for appellant was that the president and other agents of the Merchants' Bank represented to appellant that the guarantors were financially responsible for the payment of that sum, approximately, were in good financial standing and able to pay their obligation, if called upon to do so, and written statements in detail were furnished showing or purporting to show individual assets the sum of which slightly exceeded $176,000. Upon this appellee asserts that there was no evidence of a representation that the "guarantors had a combined net worth over and above their liabilities of $176,000 or any other sum." The argument seems to lay stress on the word "combined," as indicating that the guarantors were owners in common of assets to that amount—at least, we can make nothing else out of it. But that, we think, is not a fair interpretation of the bill. We would be exceedingly reluctant to decide this case, contrary to its merits, upon so fine a point.

[12-14] In the next place it is said that appellant did not rely upon the representations made to its officers Jackson and Houston. These officers depose without objection that they did rely upon the stated representations, and that they made no independent investigations to learn the facts. Evidence in terms that they relied upon the statements may have been incompetent under an old rule prevailing in this state. Sledge v. Scott, 56 Ala. 202; Western Union v. Cleveland, 53 So. 80, 169 Ala. 131, Ann. Cas. 1912B, 534. It would have better tended to develop the truth if objection had been made, though that was unnecessary under the statute, section 6565 of the Code (Cotton v. Cotton, 104 So. 650, 213 Ala. 336), but as triers of the facts we are entirely clear to the conclusion that they did rely on the representations averred and proved. Appellee construes the bill as lacking an averment that appellant relied on the written financial statements furnished, but only on verbal assurances. The averment is that appellant relied on "said statements of the solvency and net worth of said individuals," and this, in our opinion, may and should be taken as an averment that appellant relied on the statements, written as well as verbal, though it is not averred that any of the statements were in writing. Fraudulent representations must be proved as alleged, but the argument for appellee at this point would extend that rule beyond all reason.

[15, 16] The proof establishes the fraud charged in the bill. Gaddis and three others joined in executing the note for $60,000. The three others were at once relatives, friends, and business associates of Gaddis. He was in deep trouble, and it puts no strain on credulity to find that they were interested in Gaddis as much or more than in the bank, and we shall see that their signatures would cost them nothing in any event, since they were each and all insolvent, most of them hopelessly so. Appellee has little to say on this point, and we need not indulge any extended discussion. The evidence very satisfactorily shows that the makers of this note, so far from being worth $176,000 over and above liabilities, were insolvent, as we have said. We have also stated the substance of the representations made as to that. That they were material admits of no doubt. That they were deliberately made admits of no doubt. That the Chemical Bank had a right to rely on them admits of no doubt. There is scant room for belief that these guarantors of the bank's debt were not aware of their own financial responsibilities, or that Gaddis and Lancaster, two of them, to whom the representations upon which the Chemical Bank acted are attributed in the bill, were not well informed as to the financial condition of the other two. As to Gamble in particular, one of the guarantors, the representation, purporting to be a statement in detail of his assets and liabilities, was prepared in part by Gaddis with authority from Gamble to complete his statement [because Gamble was not on the ground and was therefore unable to state his indebtedness to the bank, but the court knows that he, with the rest of them, was heavily indebted], and was made false by Gaddis' omission of large items of liability of which he must have been well advised. The statements as to all of the guarantors were itemized statements of assets and liabilities; they were "solemnly" made, and were utilized, not as mere matters of opinion, but as statements of fact. As statements of opinion it may well be that they were fraudulent, but we need not go to that extreme, for "a misrepresentation of a material fact, on which another has the right to rely, whether made willfully or intentionally, or made from mistake, inadvertence, or ignorance, will operate to avoid a contract founded on it." Thweatt v. McLeod, 56 Ala. 375. Such a misrepresentation is a fraud in law. Code 1923, § 8049, declaring the common law; Harton v. Belcher, 70 So. 141, 195 Ala. 186.

[17] But it is said that the Chemical Bank did not rely on the representations as to the solvency of the guarantors, because it made investigation on its own account. It is not essential to appellant's case that it should have relied alone upon the misrepresentations averred and proved; it is enough that they formed a material part of the inducement to the transaction—contributed to it materially. Jordan v. Pickett, 78 Ala. 331. It may be that the Chemical Bank at one time intended to investigate, but Jackson and Houston, its cashier and vice president, with whom alone matters between it and the Merchants' Bank were negotiated, both testify that they made no independent investigation. Montgomery, at that time superintendent of banks, went to New York to inquire about the matter of the Merchants' Bank's liability on account of the Hall-Beale Company's defalcation, and he has to say that Jackson handed him the instrument of guaranty, which had then been signed, and said, "We have investigated those fellows," and "asked me what I thought of it." They got no information from Montgomery, though he must have been aware, from his investigations of the Merchants' Bank, that the guaranty offered to appellant was practically of no value. He seems to justify his course on the ground that to inform appellant in the respect desired would have involved him in a betrayal of the secrets of the bank, and maybe he was not wrong in this. But he told Jackson of the Chemical Bank that he knew nothing about them. We find no necessary conflict between these witnesses. It may be presumed very reasonably that by investigation Jackson intended to refer to what had already passed between appellant and Gaddis et al. and the information afforded by the written statements. Also some time, ten days, or three weeks, or maybe a month, elapsed between the time when the statements were submitted and the sending of the release to the bank in Montgomery notwithstanding the superintendent had written to appellant asking information as to whether it had released the Merchants' Bank. Jackson's excuse for the delay, if excuse he needed, was that he had been otherwise engaged and desired first to communicate further with Gaddis, the head of the bank. These circumstances hardly afford sufficient ground for an impeachment of the witnesses Jackson and Houston, but, whatever may be thought of that, if the representations of Gaddis and Lancaster contributed in material part to induce appellant's part in the transaction, that is enough.

[18] Then again, it is said that appellant does not come into court with clean hands—this, because appellant, when informing the superintendent of banks of the proposition to release the Merchants' Bank as to $60,000 of its indebtedness and its acceptance, did not inform him of the representations made on behalf of the bank in order to secure that release. It is said that the Merchants' Bank became thereby in effect a guarantor of the solvency of the guarantors and contingently liable with them. No good reason occurs to us why appellant on that occasion should have said to the superintendent of banks, "The Merchants' Bank has represented to me

that these guarantors are solvent." The only thing to be affected as between them was the propriety of allowing the bank to continue in business in view of the release. The bank was not thereby brought under any new obligation, direct or contingent. So far as the superintendent was concerned, and his duty to the public, including creditors of the bank, all the benefit of the agreement moved to the bank and its clientele—at least we may assume that to be the case, for only so was the superintendent to be justified in allowing the bank to hold its doors open. Appellee's argument at this point is based upon the assumption that originally the bank was not indebted to appellant, but the issue as to that has been solved against the argument. Contingent liability, if any there was, was of less disadvantage to the bank and its creditors than a fixed certain liability.

[18] Finally, the brief asserts that appellant, Chemical Bank, has ratified the entire transaction, in which it accepted the guaranty by Gaddis et al. of the $60,000 note of Hall-Beale Company, by reason that it had in its hands a large amount of collateral deposited by the Merchants' Bank to secure indebtedness in various large sums, aggregating $100,000 other than the indebtedness arising out of the Hall-Beale transactions, and that, after the commencement of this suit, appellant collected and applied proceeds of such collateral, after satisfying its other demands, to the payment of the note for $33,-780 made by Hall-Beale Company and indorsed by Merchants' Bank as part and parcel of the agreement whereby the bank was released of $60,000; that it could not repudiate in part and ratify in part. If it were the fact that the Merchants' Bank was not originally indebted to the Chemical Bank in the sum represented by this $33,780 note, this contention would perhaps need be conceded. But the fact is that without the transaction immediately in question the Merchants' Bank was indebted to the Chemical Bank in the sum of $33,780, as well as $60,-000, and, though repudiating the transaction by which the release of the $60,000 note was obtained, had the right to realize upon the collateral taken prior to the cotton transaction and apply the surplus proceeds in satisfaction pro tanto of the debt incurred in that transaction. The superintendent of banks claimed only in the right and title of the bank. It is not suggested that he had any better right or title. The proceeds, then, had to be credited to the bank. If the guaranty was a binding agreement, they were properly credited on the $33,780 note. If the guaranty was conceived in fraud, it is not perceived that appellant or the bank had any interest to be served by crediting them in one place rather than another. We are of opinion, therefore, that the facts in evidence furnish no reasonable ground on which to hold that appellant, pending its bill in this cause, sought to ratify, or did in fact ratify, the contract of guaranty in part, and thereby estopped itself to maintain this suit. It will be understood that everything that has been said has been said with reference to the fact that the bank is in process of liquidation, and, in this immediate connection, that we have considered only the proposition presented by the brief, viz., that by ratification in part appellant has ratified in whole. If it should develop that other collections have been made in the meantime or that other collaterals are held, they must be accounted for.

A reference was properly ordered, but the status of affairs between the Chemical Bank and the Merchants' Bank, or the superintendent of banks representing the Merchants' Bank, has been misconceived and the directions for the reference erroneously decreed. On the record the Chemical Bank is entitled to participate, pari passu with other creditors, in the distributions of the assets of the Merchants' Bank. The decree must be reversed and the cause remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

ANDERSON, C. J., and GARDNER and MILLER, JJ., concur.